**TRANSATLANTIC SHIFFAHRTSKONTOR[1] GMBH,** Plaintiff–Appellee,

v.

**SHANGHAI FOREIGN TRADE CORPORATION, Defendant– Appellant.**

**Docket No. 98–9643**

United States Court of Appeals, Second Circuit.

Argued: Oct. 7, 1999.
Decided: Feb. 25, 2000.

1. Although the official caption for this case spells the Appellee's name as "Shiffahrtskontor,"we note that, in its own documents, the Appellee spells its name in the correct German fashion, i.e., "Schiffahrskontor."

Mary Ann C. Marlowe, Keane & Marlowe, East Brunswick, N.J., for Plaintiff–Appellee.

Elliot Silverman, McDermott, Will & Emery, New York, N.Y., for Defendant–Appellant.

Before: JACOBS, CALABRESI, and SOTOMAYOR, Circuit Judges.

CALABRESI, Circuit Judge:

Defendant–Appellant Shanghai Foreign Trade Corporation ("SFTC"), an instrumentality of the People's Republic of China ("China"), appeals from a judgment of the United States District Court for the Southern District of New York (Miriam

Goldman Cedarbaum, *Judge*) denying SFTC's motion to dismiss. The district court held that Plaintiff–Appellee Transatlantic Shiffahrtskontor GmbH ("TASK") had alleged sufficient facts to overcome defendant's motion, which asserted lack of subject matter jurisdiction because of sovereign immunity and lack of personal jurisdiction. Specifically, the court found that the facts TASK alleged were enough, if proven, (1) to invoke the exception to sovereign immunity for suits based upon acts related to the commercial activities of a foreign sovereign outside of the United States that have a direct effect within the United States, *see* 28 U.S.C. § 1605(a)(2) (1994), and (2) to establish the existence of personal jurisdiction over SFTC in New York courts. We reverse.

## I. BACKGROUND

In reviewing a district court's denial of a motion to dismiss, we assume all of the nonmoving party's factual allegations to be true. *See United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In July 1984, SFTC entered into a "Cooperation Agreement" with Shanghai Municipal Metallurgical Bureau and Vincor Limited, a Hong Kong company, pursuant to which a joint venture called Vincor Shipping Company Limited ("VSL") was established.

In 1984, TASK, a German corporation, contracted for the charter of TASK-owned vessels with VSL, which represented itself as an agent of SFTC. Ultimately, VSL and TASK entered into twenty-one contracts, all of them substantially the same. According to the terms of the contracts, payment was to be made by VSL into a bank account in New York in the following form: ninety-five percent of payment was to be made prior to delivery of the cargo and the remaining five percent plus any demurrage [2] would be paid upon delivery.

2. "Demurrage" is remuneration of the ship-

owner for the detention of its vessel beyond

As a result of severe congestion in the port of Shanghai in 1984 and 1985, a majority of the ships operating under the contracts were delayed, some for as long as six weeks, and VSL thereby incurred substantial demurrage in favor of TASK. SFTC, which TASK alleges was to indemnify VSL for any demurrage (although TASK variously attributes this obligation to agency law and to some "internal agreement" between SFTC and VSL), failed to pay VSL for the demurrage costs. VSL in turn failed to pay TASK.

At different times between 1985 and 1989 and as called for in the contracts, TASK pursued through arbitration in Hong Kong its claims against VSL, including those for the unpaid demurrage. SFTC retained Hong Kong solicitors to participate in VSL's defense of these actions. Following a December 1987 arbitration award, part of TASK's claims were satisfied. An additional arbitral award was entered in favor of TASK on some of its other claims in June 1989.

Meanwhile, in December 1988, having changed its name to Harlifax, VSL declared voluntary liquidation in Hong Kong. TASK, as a creditor of VSL, requested that the Supreme Court of Hong Kong appoint bankruptcy liquidators for VSL. Once named, these liquidators, acting on behalf of VSL initiated three court proceedings in Hong Kong against SFTC. SFTC failed to appear and default judgments were entered in the name of VSL in all three cases. One judgment was to recover monies that VSL had transferred to SFTC prior to its declaration of bankruptcy. Another was for indemnification in the amount of the June 1989 arbitral award obtained by TASK against VSL. And the third judgment was for indemnification for the amount VSL owed TASK on TASK's remaining contractual claims. Significantly, the Hong Kong court gave no indication of what relationship between

the number of days allowed by the charter-party. *See* Black's Law Dictionary 432 (6th

VSL and SFTC had caused SFTC to owe VSL these monies—why, in other words, it had to indemnify VSL. TASK was not a party in these suits. In March 1994, the liquidators assigned these three judgments to TASK in satisfaction of TASK's outstanding claims against VSL's bankruptcy estate.

Because SFTC failed to pay the judgments, TASK brought suit in the Southern District of New York in April 1996 seeking to convert the Hong Kong judgments into U.S. judgments. On March 13, 1998, the district court (Cedarbaum, *J.*) granted SFTC's motion to dismiss for lack of both subject matter and personal jurisdiction. Judge Cedarbaum found, first, that SFTC was immune from suit in federal court under the Foreign Sovereign Immunities Act ("FSIA") and, second, that TASK had failed to make a prima facie showing that SFTC was subject either to specific or to general jurisdiction in New York. On November 16, 1998, however, the district court granted TASK's motion for reconsideration and vacated its March 1998 decision. The court found that SFTC was suable under the third clause of 28 U.S.C. § 1605(a)(2), the commercial activity exception to the FSIA. It also found that, based upon representations made by TASK's counsel at oral argument, TASK had presented a prima facie case of personal jurisdiction.

■ SFTC now brings an interlocutory appeal of the district court's denial of its claim of sovereign immunity. We have jurisdiction over this appeal because the denial, on FSIA immunity grounds, of a motion to dismiss is immediately appealable as a collateral order. *See Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 324 (2d Cir.1993).

ed.1990).

## II. DISCUSSION

### A. The FSIA and the Commercial Activity Exception

■ In suits against foreign sovereigns, it is well settled that the FSIA provides the only basis for the subject-matter jurisdiction of U.S. courts. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Thus, a foreign state, including its agencies and instrumentalities, is presumptively immune from suit in U.S. courts unless a specific FSIA exception to such immunity applies. *See* 28 U.S.C. § 1603(a)-(b); *Nelson,* 507 U.S. at 355, 113 S.Ct. 1471. TASK invoked two FSIA exceptions to immunity in the district court. The first was § 1605(a)(2), which creates what is known as the commercial activity exception to foreign sovereign immunity. The second was § 1605(a)(1), which permits suits when "the foreign state has waived its immunity either explicitly or by implication."

### 1. The Commercial Activity Exception

■ Section 1605(a) states that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (2) in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). This exception contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act.

### i. An Act Outside the United States Having a Direct Effect In the United States

The act that TASK claims caused a direct effect "within the United States" in this case is the failure of VSL to deposit funds into a New York bank account as specified in the charter contracts. SFTC argues, however, that, on the facts of this case, such a failure to deposit could not have given rise to the requisite effect. It further asserts that, even if the failure to pay the money into the New York account were conceded to have caused an "effect in the United States," that effect was not the direct result of any act undertaken by SFTC. That is, SFTC contends that the contracts at issue in this case were between VSL and TASK, that SFTC was not a party to them and that it therefore had no obligation to make any payments into any New York account. At most, according to SFTC, SFTC breached a duty to indemnify VSL, which as a result failed to pay TASK in New York. SFTC claims, therefore, that its connection to the New York payment was mediated by VSL and that the effect in New York was, if anything, only *indirectly* related to any acts attributable to it.

TASK replies by arguing that, under Supreme Court precedent, the failure to pay money into the New York account gave rise to a sufficient effect within the States. *See Republic of Argentina v. Weltover,* 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (finding a direct effect where Argentina failed to make a deposit into a New York bank account). TASK also argues that, because SFTC and VSL had a principal-agent relationship, the actions of VSL were, for the purposes of FSIA analysis, attributable to SFTC. It would follow that VSL's failure to pay into the New York account were as much actions of SFTC as if VSL had never even been involved. The effect in New York would, as a result, qualify as a direct effect of SFTC's acts.

Both the questions of whether the effect is enough to meet the statutory requirements and whether the necessary principal-agent relationship exists are complex. But we need not decide them. We will instead assume, for purposes of this opinion, that TASK has raised sufficient issues

of fact as to each so that at this stage of the proceedings it is appropriate to act as if an "effect in the United States" exists and as if there were the kind of principal-agent relationship between SFTC and VSL that would make that effect directly attributable to SFTC.

### ii.  Based Upon

But, in order to find jurisdiction under the third clause of § 1605(a)(2) of the FSIA, it is not enough to find that the defendant committed some act "in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States." We must also find that the plaintiff's suit in U.S. courts is "based upon" that act.

SFTC argues that because this suit is to enforce Hong Kong judgments, it is "based upon" those judgments rather than on the acts that underlie them. In support of this contention, it cites language in *Nelson* indicating that an action is based upon "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." 507 U.S. at 357, 113 S.Ct. 1471. And it asserts that the elements of a claim on a foreign judgment—what, in other words, must be shown in order to enforce such a judgment in a U.S. court—are simply that the foreign judgment be final, conclusive, and enforceable where rendered. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 583 (2d Cir.1993). None of these elements, SFTC points out, has anything to do with the acts that TASK has identified as having caused a direct effect within the United States.[3]

SFTC's contention, however, seems to be inconsistent with our prior case law. *See International Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11–12 (2d Cir.1989) (examining the conduct—i.e., the breach of contract—underlying a foreign judgment to determine whether jurisdiction existed in a suit to enforce a default judgment entered in the Bahamas).[4] Moreover, SFTC's position would, in practice, preclude plaintiffs from enforcing any foreign judgments against foreign sovereigns in U.S. courts under § 1605(a)(2). For the elements of such an enforcement action would never have anything to do with the underlying commercial activity.

■  How we resolve the tension between *International Housing* and SFTC's position would have a significant impact on U.S. foreign relations. This is especially so, given that the United States is currently involved in negotiations concerning a proposed Hague Convention on the Recognition and Enforcement of Foreign Judgments. *See* Arthur T. Von Mehren, *Enforcing Judgments Abroad: Reflections on the Design of Recognition Conventions*, 24 Brooklyn J. Int'l L. 17, 18 (1998). Fortunately, we need not decide this sensitive question either. For, even assuming that—contrary to SFTC's contention—we are permitted to look at the conduct underlying the Hong Kong judgments, we nevertheless conclude that TASK has failed to create an issue of fact as to whether its suit in the district court was *"based upon"* an act that "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added).

---

**3.**  SFTC also appears to argue that the provision within the FSIA establishing jurisdiction over suits to confirm foreign arbitral awards, *see* 28 U.S.C. § 1605(a)(6), implies that the judgments of foreign courts against foreign sovereigns are not enforceable in U.S. courts because there is no provision in the FSIA creating jurisdiction over suits to enforce them.

**4.**  *International Housing* was decided prior to *Nelson* and is in some tension with a literal reading of the definition of "based upon" used by the Supreme Court in *Nelson*. But, because *Nelson* did not involve an action to enforce a foreign judgment, the Supreme Court did not expressly address this issue when formulating its definition of "based upon" in that case. And we take no position today concerning the impact of *Nelson* on our approach in *International Housing Ltd.*

■■ What does "based upon" mean? At a minimum, that language implies a causal relationship. Thus, at the least, the "act that caused a direct effect in the United States" ("the Act") must be a "but for" cause of the judgments that are the ground of this suit. That is, it must be true that without the Act, there would be no judgments on which to sue. But this is not enough. Where a causal relationship is required, we must also always ask how close that relationship must be to suffice. When the causal requirement is imposed by the common law, that closeness is usually expressed in terms of proximate cause and of causal link or tendency. *See Moore v. PaineWebber, Inc.,* 189 F.3d 165, 174 (2d Cir.1999) (Calabresi, J., concurring). Where, instead, the requirement is statutory, it is the statute itself that establishes how near or how distant the "but for" cause must be if it is to meet the statutory test. *See Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 237 (2d Cir.1996); *Moore,* 189 F.3d at 178 (Calabresi, J., concurring) ("It should not be forgotten, however, that the pertinent requirements of proximate cause in a RICO case are those intended by the legislature that passed the statute, and not those of the common law."). In the case before us, it is therefore the FSIA that determines the proximity—between the Act and the suit—that must be present in order for the suit to be "based upon" that Act.

We know from *Nelson* that "based upon" requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements. *See Nelson,* 507 U.S. at 357, 113 S.Ct. 1471.

We decline to decide today, as SFTC would have us do, that *any* suit brought on a foreign judgment—rather than on the conduct that underlies that judgment—is too distant (though we do not exclude that possibility). But we conclude that nothing that *TASK* has alleged would permit us to find that the relationship required by the statutory language exists, in this case.

The legal proceedings against SFTC that resulted in the three default judgments that TASK now seeks to enforce were brought by VSL's Hong Kong liquidators against SFTC on behalf of VSL.[5] TASK now has a claim against SFTC only because the VSL liquidators chose to assign to TASK *these judgments* rather than some other assets that would have satisfied TASK's claims in the amount of HK$ 12,512,940.36 against VSL.[6] But how VSL's liquidators chose to pay TASK was not in any way dependent on the New York contract or on any acts in breach of that contract that had a direct effect in New York. And TASK was, presumably, indifferent to how this payment was to be accomplished.

■ Thus, VSL's obligations to TASK might have been satisfied with cash, with a pot of gold, or with HK$ 12,512,940.36 worth of bananas. Similarly, VSL might have assigned to TASK foreign court judgments that VSL obtained against SFTC for SFTC's breach of a contract whose entire locus and place of performance had nothing to do with the United States or with TASK. Had VSL done this, it clearly could not be argued that these judgments were "based upon" acts having a direct effect in the United States. For even assuming that foreign judgments, or the assignment of them, can ever satisfy the

---

**5.** These actions were allegedly brought by the liquidators at the request of TASK.

**6.** The deed of assignment states that VSL "has admitted the Assignee [TASK] to proof as a creditor in the sum of HK$ 12,512,940.36 ('the liability'). The said proof was filed in respect of certain arbitration awards, a High Court judgment and claims under various charterparty agreements

entered into between the Assignor (formerly known as 'Vincor Shipping Co. Ltd.') and the Assignee." The deed goes on to state that "[t]he Assignor has agreed to assign all or any of its rights against Shanghai Foreign Trade Corporation ('Shantra'), including certain judgments and judgment debts ... to the Assignee for the agreed sum."

"based upon" requirement, if the acts upon which the assigned judgments are themselves grounded do not meet the "based upon" requirement of § 1605(a)(2) of the FSIA—i.e., where they are not acts taken in connection with a commercial activity that caused a direct effect in the United States—an action to enforce the foreign judgments in U.S. courts must fail for lack of subject matter jurisdiction.

One could argue more broadly that any judgment that was purchased by, or assigned to, the plaintiff, is *ipso facto* too distant, even if that same judgment—had it been won directly by the plaintiff—would be proximate enough to qualify. Nevertheless, just as we declined to decide whether suits on any foreign judgments are automatically too distant to be "based upon" the requisite Act, so we need not determine today whether every assigned, or purchased, judgment fails to meet the statutory requirement. It is enough for us to say that any assigned or purchased judgment is unlikely to qualify as "based upon" the requisite U.S. Act of the assignor, and that further analysis in the context of this case would be unhelpful and speculative because nothing in the record indicates the legal basis of SFTC's obligation to pay VSL. (The Hong Kong court's determination that SFTC was bound to indemnify VSL for its liabilities to TASK does not tell us how or why this obligation arose.) Thus, even if we assume that this failure to pay had the requisite direct effect in the United States, we are bound, under the circumstances, to hold that TASK has not made allegations sufficient for us to find that its action against SFTC is in fact based upon VSL's assumedly U.S. Acts.

### 2. Waiver of FSIA Immunity

■ Before the trial court, TASK also argued that China (and therefore SFTC) had implicitly waived its sovereign immunity because China was a signatory to the Convention on the Recognition and Enforcement of Arbitral Awards (the "Convention"). The district court properly rejected the argument.

In *Seetransport,* we held that Romania, by becoming a signatory to the Convention and entering into a contract with an arbitration clause and participating in arbitration proceedings, had waived its sovereign immunity for the purposes of challenging U.S. jurisdiction over a suit to enforce the arbitral awards resulting from that contract. *See* 989 F.2d at 578–79. Moreover, after dismissing the claim for enforcement of the arbitration awards as time-barred, we found that a separate claim to convert a Paris Court of Appeals judgment, which dismissed the Romanian company's direct appeal of the arbitration awards, into a U.S. judgment had to be allowed under the same exception because "the cause of action is so closely related to the claim for enforcement of the arbitral award." *Id.* at 583.

■ Although one of the judgments in this case orders SFTC to pay VSL the amount awarded TASK in an arbitral award against VSL, there are differences between this case and *Seetransport* that preclude any direct application of our holding in that case to these facts. The judgment before us did not result from a direct appeal of the arbitral award, as in *Seetransport,* but rather from a suit by VSL against SFTC for indemnification. The judgment ordering indemnification—and not a judgment reviewing (and confirming) the arbitral award itself—is what TASK seeks to enforce in our courts. Because the implied waiver exception is to be construed narrowly, *see Drexel Burnham Lambert Group, Inc.,* 12 F.3d at 325, and because it is hard to view this suit as being in essence a suit designed to enforce an arbitral award, we believe that the exception is inapplicable to this case.

### III. CONCLUSION

Since we find no subject matter jurisdiction, we need not reach the question of personal jurisdiction over SFTC. We hold

that the district court erred in concluding that SFTC was subject to suit in U.S. courts under the commercial activity exception of the FSIA. We likewise find that SFTC did not waive its immunity by signing the Convention enforcing arbitral awards. We therefore remand to the district court for the entry of an order granting SFTC's motion to dismiss.