**PAREX BANK, Plaintiff,**

**v.**

**RUSSIAN SAVINGS BANK a/k/a Sav-
ings Bank of the Russian Federation
a/k/a Russian Federation Savings
Bank a/k/a Commercial Savings Bank
of the Russian Federation a/k/a Sber-
bank, Defendant.**

No. 99 Civ. 8760 (RWS).

United States District Court,
S.D. New York.

Sept. 20, 2000.

Verner Simon, New York City, by Paul W. Verner, of counsel, for plaintiff.

Cleary, Gottlieb, Steen & Hamilton, New York City, by Howard Zelbo, of counsel, for defendant.

### OPINION

SWEET, District Judge.

Defendant Russian Savings Bank, a/k/a Savings Bank of the Russian Federation a/k/a Russian Federation Savings Bank a/k/a Commercial Savings Bank of the Russian Federation a/k/a Sberbank ("Sberbank") moves, pursuant to Rules 12(b)(2) and (6), Fed.R.Civ.P, to dismiss the complaint filed by Plaintiff Parex Bank ("Parex") on the grounds of lack of personal jurisdiction, *forum non conveniens,* and failure to state a claim upon which relief can be granted. For the reasons stated below, the motions are denied in part and granted in part.

### The Parties

Plaintiff Parex Bank is a financial institution organized and existing under the laws of Latvia.

Defendant Sberbank is an open joint-stock company organized under the laws of the Russian Federation. Its majority shareholder is the Central Bank of the Russian Federation, and its principal place of business is Moscow.

### Prior Proceedings

The prior proceedings of this action are set forth in the prior opinion of this Court, which held that Sberbank properly removed the case from state to federal court. *See Parex Bank v. Russian Savings Bank,* 81 F.Supp.2d 506, 508 (S.D.N.Y.2000).

Parex filed the complaint in New York Supreme Court on July 21, 1999, claiming breach of contract and deceptive business acts and practices under New York's General Business Law ("NYGBL"). Sberbank removed the action to this Court on August 9, 1999. The dispute arose out of Sberbank's alleged failure to honor a nondeliverable forward exchange contract ("NDF contract")[1] between the parties in the aftermath of Russia's 1998 financial crisis.

### Facts

On March 11, 1998, a Parex trader in Riga, Latvia telephonically initiated a contract for a non-deliverable forward transaction with Sberbank in Moscow. The parties agreed to exchange rubles for dollars at the currency exchange rate as of March 9, 1999. The agreement was

---

1. Before the economic crisis triggered by Russia's domestic debt default on August 19, 1998, "nondeliverable forward exchange contracts" were the preferred means by which foreign investors hedged investments in ruble-denominated Russian securities. Banks offered investors the opportunity to convert rubles into dollars at a certain exchange rate on a particular date. If on that date the ruble was more expensive than the contract amount, the bank profited; if the ruble had declined in value, the investor gained.

memorialized only by Reuters electronic records rather than in a signed, written contract. At the time the contract was entered into, the value of the Russian ruble was determined by the MICEX exchange and fluctuated based on market trading within a trading band set by the Russian government. To the extent that the exchange rate moved unfavorably for a party, the contract required that party to pay the other party the difference between the MICEX dollar-ruble exchange rate on March 9, 1999 and the agreed amount of 6.9 multiplied by 5,362,318.84. The difference was to be transferred in dollars into the other party's Bank of New York account. Upon Sberbank's request, Parex transferred a $268,116 security deposit into Sberbank's Bank of New York account, which Sberbank held from March 11, 1998 through March 10, 1999.

Five months after the NDF contract was negotiated, Russia suffered a financial crisis that fundamentally altered its financial landscape. Like other emerging world markets, Russia's financial system collapsed after violence erupted in Indonesia in May 1998. In August of 1998, Russia's Central Bank enacted emergency measures to counteract the country's serious liquidity problem. On August 17, the Russian Government announced a package of severe economic measures: First, it raised the trading band, which allowed the ruble to devalue; second, it ordered a 90–day moratorium on the repayment of foreign debt by banks; and third, it announced the restructuring of ruble-denominated debt. Russian citizens withdrew their savings from banks en masse and stores closed. In late August of 1998, the ruble-dollar trading on the MICEX exchange was temporarily suspended. From August to the beginning of September, the ruble lost a significant portion of its face value.

In early September, due to the combination of the economic crisis, the non-existence of any MICEX exchange rate on which to assess the NDF contract, and the moratorium on paying back foreign debt, Sberbank representatives contacted Parex in an attempt to settle the NDF contract.

Sberbank offered to settle at a rate equivalent to the ceiling for rubles set by the Russian government in 1998, 7.15 rubles per dollar. Parex objected to what it viewed as Sberbank's altering the terms of the NDF contract. The ensuing negotiations took place either in Moscow or by telephone between Riga and Moscow through February of 1999, and failed to produce a settlement.

On the value date of March 9, 1999, Parex demanded that Sberbank transfer $3,755,642.01 to Parex's Bank of New York account in satisfaction of the contract. On March 10, 1999, Parex sent Sberbank a letter again demanding immediate payment. Attached to that letter was a copy of a claim for relief Parex had filed at the Moscow City Arbitration Court, the Russian state commercial court that has jurisdiction over this dispute.

The parties met once more on March 22, 1999, but failed to reach an agreement. Parex filed this action in the New York Supreme Court three months later, and Sberbank properly removed it to this Court on August 9, 1999 pursuant to 28 U.S.C. §§ 1330(a) and 1446(d).

Sberbank filed the instant motion to dismiss on March 24, 2000. Parex filed a memorandum in response on May 22, 2000 and the motion was deemed fully submitted when Sberbank filed its reply memorandum on June 20, 2000.

## Discussion

### I. Legal Standard

For the purposes of this motion to dismiss, the material facts alleged in the complaint are accepted as true. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996); *O'Brien v. Alexander,* 101 F.3d 1479, 1484 (2d Cir. 1996). All reasonable inferences should be drawn in favor of the plaintiff. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985) (when deciding a motion to dismiss for lack of jurisdiction pursuant to

12(b)(2) without an evidentiary hearing, all doubts must be resolved in favor of party asserting personal jurisdiction).

## II. Subject Matter Jurisdiction

Where a case is brought against a "foreign state," the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 et seq., provides that personal jurisdiction exists where there is both subject matter jurisdiction and proper service. 28 U.S.C. § 1330(a), (b); *see Seetransport Wiking Trader v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir.1993) (*citing Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982)). This Court concluded in a prior opinion that Sberbank, as an instrumentality or agency of the Russian State, qualifies as a "foreign state" under the FSIA. *Parex Bank v. Russian Savings Bank*, 81 F.Supp.2d 506, 508 (S.D.N.Y.2000). The parties do not contest whether service was proper pursuant to 28 U.S.C. § 1608. Although the parties did not raise the issue of subject matter jurisdiction, it is a threshold question that must be addressed under the FSIA before reaching the personal jurisdiction analysis.

### A. Commercial Activity Exception to Sovereign Immunity

■ The FSIA is the only basis for the subject-matter jurisdiction of the United States courts. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); *Transatlantic Shifahrtskontor v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 388 (2d Cir.2000). Under the FSIA, foreign states are immune from suit in the United States unless one of several exceptions applies. *See* 28 U.S.C. §§ 1604, 1605; *Nelson*, 507 U.S. at 355, 113 S.Ct. 1471; *Transatlantic Shifahrtskontor*, 204 F.3d at 388.

■ The most relevant exception to foreign sovereign immunity is the "commercial activity" exception, which provides

that a foreign state is not immune from suit in any case:

> in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere *and that act causes a direct effect in the United states.*

28 U.S.C. § 1605(a)(2). A state is involved in "commercial activity" under the FSIA when it functions like an actor in the private marketplace rather than in a governmental or public capacity. *See Nelson*, 507 U.S. at 360, 113 S.Ct. 1471; *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 130 (2d Cir.1998); 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."). An act is made "in connection" with commercial activity if there is a "substantive connection" or "causal link" between the act and the commercial activity. *See id.*

The "act" at issue here, Sberbank's failure to deposit funds into Parex's Bank of New York account, arises out of a deal transacted outside of the United States, in Moscow and Riga. Despite the fact that one of the parties to the exchange was a foreign state, the rubles for dollars exchange at issue here was conducted as a private transaction rather than as a public service, and as such constitutes "commercial activity." *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 616, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (rejecting the argument that the issuance of bonds to address a domestic debt crisis rendered the transaction public). The only issue remaining to establish whether the Court has subject matter jurisdiction over this case is whether Sberbank's failure to deposit funds into Parex's Bank of New York account caused a "direct effect" in the United States.

### B. Direct Effect

■ The Supreme Court construed the "direct effect" requirement of the FSIA in

a case remarkably similar to this one, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), which involved Argentina's unilateral rescheduling of the repayment dates on bonds it had issued in an attempt to stabilize its currency. Two Panamanian corporations and a Swiss bank brought suit to enforce full payment of the bonds, in dollars, into their New York bank accounts. The Supreme Court held that an effect is direct for the purposes of the FSIA if "it follows 'as an immediate consequence of the defendant's ... activity,'" but need not be either substantial or foreseeable. *Id.* at 618, 112 S.Ct. 2160 (*quoting Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991)). The Court held that Argentina's action had a direct effect in the United States, because the plaintiffs:

> had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming. We reject Argentina's suggestion that the "direct effect" requirement cannot be satisfied where the plaintiffs are all foreign corporations with no other connections to the United States.

*Weltover*, 504 U.S. at 619, 112 S.Ct. 2160.

The Second Circuit requires that the conduct having a direct effect in the United States be "legally significant" in order for the commercial activity exception to apply. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 930 (2d Cir.1998); *Antares Aircraft L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir.1993), *cert. denied*, 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). Employing this test, the Second Circuit recently held that an Indonesian state bank's failure to pay on a letter of credit owed to a Korean bank for deposit in New York caused a direct effect in the United States. *Hanil Bank*, 148 F.3d at 133. As here, the contract had been entered into out of the United States, and the only connection to the United States was the bank account into which the funds were to have been deposited. *Id.* at 129–30. By contractually consenting to pay the funds into the plaintiff's New York account and then failing to do so, the Court held, the Indonesian bank caused a legally significant direct effect in New York. *Id.* at 132–33. *See also Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir.1994) (finding direct effect in the United States where Iraqi state bank's failure to remit funds to New York accounts of foreign bank syndicate under letter of credit and commercial guarantees).

Under this reasoning, there is subject matter jurisdiction over the instant dispute. As in *Weltover* and *Hanil Bank*, neither party here is a citizen of the United States, and one of them is a foreign state. The parties contracted at a location outside the United States that a monetary deposit would be made by one party into the other party's New York bank account. And, as in both *Weltover* and *Hanil Bank*, "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Weltover*, 504 U.S. at 609, 112 S.Ct. 2160. Under the law of this Circuit, Sberbank's failure to deposit dollars into Parex's Bank of New York account caused a legally significant direct effect in the United States. Therefore, every element of FSIA § 1605(a)(2) has been met, and this Court has subject matter jurisdiction over the case.

### III. *Personal Jurisdiction*

There is subject matter jurisdiction and service was proper, but it is unclear whether these factors alone give rise to personal jurisdiction over Sberbank. Although the Second Circuit once held that these factors automatically confer personal

jurisdiction, *see Seetransport,* 989 F.2d at 579, the Circuit has more recently recognized that the exercise of personal jurisdiction might also have to meet constitutional due process requirements, *see Hanil Bank,* 148 F.3d at 134. Because the law of this Circuit remains unclear, this Court will conduct a constitutional analysis in order to determine whether personal jurisdiction exists over this foreign state defendant.

 The Due Process Clause of the Fifth Amendment requires that courts not exercise personal jurisdiction over a defendant unless that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington,* 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (*citing Milliken v. Meyer,* 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). These minimum contacts must represent some "act by which the defendant purposefully avails itself of the privilege of conducting activities in the forum State, thus invoking the benefits and protections of its law." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

As in *Hanil Bank,* Sberbank's actions surrounding this currency transaction were sufficient to establish the constitutionally requisite minimum contacts to support the exercise of personal jurisdiction. Sberbank consented to make payment in dollars to Parex's Bank of New York account in the event that the exchange rate changed unfavorably, and to receive payment into its New York account if the rate changed favorably. In addition, Sberbank accepted Parex's security deposit into its own Bank of New York account as security for the repayment of the NDF contract when it was due. And, accepting the allegations in the complaint as true for the purposes of this motion to dismiss, Sberbank "routinely conducts exchange deals through and in New York state via various mechanisms for transfers of funds through use of New York state regulated banking institutions." Compl. ¶ 4. As this Court has previously noted, Sberbank "does business" in New York. *Parex Bank v. Russian Savings Bank,* 81 F.Supp.2d at 506.

In combination, Sberbank's use of accounts at Bank of New York for this particular transaction and its practice of conducting other similar transactions using New York banks establishes Sberbank's "minimum contacts" with this jurisdiction. *See Hanil Bank,* 148 F.3d at 134 (finding personal jurisdiction over foreign state defendant based on transaction at issue as well as other similar transactions employing New York banks). By regularly engaging in transactions involving New York banks and by agreeing to New York as the site of performance of this contract, Sberbank could reasonably anticipate being haled into court here, and the exercise of personal jurisdiction over it does not "offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (citation and internal quotations omitted). *See Hanil Bank,* 148 F.3d at 134 (noting that given FSIA's purpose of providing foreign litigants access to United States courts, foreign state defendant should reasonably have expected to be sued here for failure to make payment in New York on foreign contract).

### IV. *Forum Non Conveniens*

 District courts have discretion to decide whether to dismiss for *forum non conveniens. See Piper Aircraft Company v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998). The equitable doctrine of *forum non conveniens* allows a court to dismiss even if the court is a permissible venue and has proper jurisdiction over the claim. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *PT United Can Co. Ltd. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998). This inquiry involves two steps: (1) determining wheth-

er there is an adequate alternate forum for the dispute, *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993), and (2) balancing the public and private interest factors the Supreme Court described in *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839.

The overriding question is "whether the convenience of the parties and the ends of justice would best be served by dismissing the action." *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292–93 (2d Cir.1996) (*quoting Koster v. (American) Lumbermens Mut. Casualty Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). While the plaintiff's choice of forum is normally given "substantial deference," *Piper Aircraft,* 454 U.S. at 256, 102 S.Ct. 252, a foreign plaintiff's' choice of forum is given less deference than that of a domestic plaintiff. *See id.; Murray,* 81 F.3d at 290.

## A. Adequate Alternative Forum

The first step of the *forum non conveniens* inquiry requires the Court to determine whether Russia would be an adequate alternative forum in which to adjudicate this dispute. A foreign forum is not inadequate merely because its justice system differs from that of the United States. *Blanco,* 997 F.2d at 982. Furthermore, comity requires that this Court abstain from adversely judging the quality of Russia's justice system unless Parex makes a showing of inadequate procedural safeguards. *See PT United,* 138 F.3d at 73; *Blanco,* 997 F.2d at 982 ("[I]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.") (citation omitted). Absent such a showing, it is "rare" that courts find that an alternative forum to be inadequate. *Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. 252; *PT United,* 138 F.3d at 73; *Blanco,* 997 F.2d at 981.

Russia is an adequate alternative forum if (1) Sberbank is subject to service of process there, and (2) the forum permits a satisfactory remedy. *See Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. 252; *Alfadda,* 159 F.3d at 45. Both parties agree that Sberbank is subject to service of process in Russia and that the Moscow City Arbitration Court has jurisdiction over this case. (*See* Parex Mem. at 7–8; Sberbank Mem. at 7.)

The question thus becomes whether the Moscow City Arbitration Court permits a satisfactory remedy. A foreign forum is not inadequate despite employing different procedures, *see, e.g., Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991), or due to general allegations of judicial corruption, *see, e.g., Blanco,* 997 F.2d at 981–82. And, while an alternate forum's less favorable substantive law should ordinarily not weigh heavily against dismissal, this factor increases in significance when "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. 252. This high standard is met in cases where, for example, the foreign forum "does not permit litigation of the subject matter of the dispute," *id.,* 454 U.S. at 254 n. 22, 102 S.Ct. 252, or "would deny [the plaintiff] access to its judicial system on the claims in his complaint," *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 678 (D.C.Cir.1996), or if the decision to dismiss "would render a plaintiff unable to pursue his or her action elsewhere," *Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1225 (3d Cir.1995).

Parex contends that it cannot get a satisfactory remedy in Russia for three primary reasons: (1) Russian courts do not provide sufficient procedural safeguards to ensure a fair trial; (2) the Russian courts will be biased against Parex, a Latvian entity, due to the tumultuous political climate between the two now-independent nations, and (3) Russian courts do not recognize the validity of the NDF exchange contract between banking institutions. As the moving party, Sberbank bears the burden of proving that Russia

**424**

will provide an adequate forum. *See Schertenleib v. Traum,* 589 F.2d 1156, 1160 (2d Cir.1978).

### 1. *Russian Courts' Procedural Safeguards*

■ Sberbank has introduced a declaration from the Dean of the Moscow State University Law School, Yevgeny A. Sukhanov, who took part in drafting the emerging Civil Code of Russia and has authored over 300 published works in the area of Russian law. Sukhanov Decl. at 2. Sukhanov's description of the Russian constitution and laws is uncontested by Parex and will be accepted as true. The Russian civil law system is characteristic of European continental law in general, and is modeled on German law in particular. Institutional fairness of the Russian justice system is ensured by a constitutionally mandated independent judiciary and numerous procedural protections under the main federal law governing property relations, the Civil Code. In civil cases, these safeguards include, *inter alia,* the presumption of equality of parties, adversarial presentation of oral and written evidence, lifetime tenure for judges, and appellate review.

The Code of Arbitration Procedure of the Russian Federation of 1995 ("CAP") expressly provides that foreign organizations have the right to seek enforcement of their violated or disputed rights in the Russian arbitration courts and shall enjoy the same procedural rights as Russian organizations. CAP Art. 210 §§ 1, 2. The CAP provides that arbitration courts may apply any applicable law, including domestic law, international treaties, or the laws of other countries. Arbitration courts have the power to adjudicate the breach of contract claims, to order reimbursement, damages, and penalties.

Rather than contesting the validity of the laws Sukhanov describes, Parex suggests that Sukhanov himself is biased (as "a Russian with state ties"), and instead offers evidence that the Russian judicial system does not in reality function in the manner its laws provide. First, Parex's "expert," Stanislaw Pomorski, a Polish-born law professor at Rutgers University, submits that:

> the reality of the administration of justice by the Russian *arbitrazh* [arbitration] courts departs radically from the procedural guarantees of litigants rights as written. The procedures consist largely of secret trials at which no witness testimony is permitted and no reliable record maintained. Judges often lack genuine independence and enforcement of judgments ranges from difficult to impossible.

(Pomorski Decl. at 2.) Pomorski alleges, *inter alia,* that in practice, oral testimony is prohibited, reliable recordkeeping is nonexistent, dockets are overburdened, Russian judges are subject to bias in favor of the state due to underfunding and political pressure, and Russian judges are not knowledgeable about complex commercial litigation. (*Id.* at 3–10.) In sum, while implicitly conceding that Russian law as codified provides adequate procedural guarantees, Pomorski contends that the "'law in action' radically differs from the 'law in books.'" (*Id.* at 3, 4–8.)

It is unclear whether Pomorski's knowledge of the actual workings of the Russian judicial system derives from anywhere other than the law review articles he cites. Parex has introduced no evidence to suggest that Pomorski has any independent expertise in this area. Furthermore, Professor Sukhanov, who practices and teaches law in Russia, convincingly outlines the shortcomings of the articles on which Pomorski relies: one was written by a recent graduate of a Russian law school with no practical work experience in Russian courts; the author of a second cited article sent written apologies to Russian legal experts (including Sukhanov) after he unsuccessfully sought to advise in the drafting process of the new laws; and the conclusions of a third author are simply not substantiated. (*See* Sukhanov Decl. at 4–7). Furthermore, Sukhanov demonstrates that oral argument is in fact heard on a regular basis in civil claims.

Even if Russia employs different procedures than the United States courts, Sberbank has met its burden of proving that Russia's judicial system affords adequate procedural protections upon the face of its statutory provisions. *See, e.g., PT United,* 138 F.3d at 74 (holding that district court properly dismissed case on *forum non conveniens* grounds because Indonesia, although not providing identical procedures, was an adequate alternate forum); *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse,* 652 F.Supp. 1289, 1295–96 (S.D.N.Y.1987) (procedures in foreign forum need not be identical to those in United States to be adequate, so long as they are not "wholly devoid of due process") (citation and internal quotations omitted). Parex has failed to establish conclusively that the current practice fails to comply with the procedural provisions of Russian law.

### 2. *Alleged Bias Against Latvian Litigants*

 Parex next suggests that due the politically tumultuous past and current relationship between the newly independent nations of Latvia and Russia, Russian courts discriminate against Latvian litigants. In particular, Parex cites a proposed resolution introduced in the Russian legislature, the Duma, which provides in relevant part that:

> [a]ny claims, legal and arbitration actions in rem filed by the Government of the Latvian Republic or . . . or other [Latvian] organizations . . . in connection with failure to conduct . . . any foreign trade or other international economic transactions . . . as well as in connection with failure to conduct . . . any transaction due to suspension of activities or enterprises and organizations [doing business with Latvian organizations] . . . shall not be granted.

(Pomorski Decl.Ex. E, Draft Proposal of Russian Federal Law, "On Measures Adopted by Russian Federation to Prevent Violation of Basic Rights and Liberties of Citizens of Russian Federation and Russian Nationals in Latvian Republic," (no date provided).)

However, although this proposed resolution may be probative of a *political* climate in Russia, it does not provide substantive evidence of any institutional *judicial* bias against Latvians, all the more so because it has not been passed. Even if it were passed, the resolution would not bind Russian courts and would only have the force of a political declaration. Such conclusory allegations of judicial bias are insufficient to support a finding that Russia is not an adequate alternate forum. *See, e.g., Sussman v. Bank of Israel,* 801 F.Supp. 1068 (S.D.N.Y.1992), *aff'd,* 990 F.2d 71 (2d Cir. 1993).

It is notable that Parex did not find Russia to be an inadequate forum due to lack of procedural fairness or discrimination when it filed its initial complaint in the Moscow City Arbitration Court in early March of 1999. It was not until July 18, 1999, just ten days after the Russia's highest commercial court issued the *Moskomprivatbank* decision discussed below, that Parex decided Russia was no longer an adequate forum and filed suit in United States courts. Parex's submissions do not present sufficient evidence to rebut Sberbank's showing that Russia's arbitration tribunals will afford foreign litigants a fair trial to vindicate their claims.[2] *See, e.g., Blanco,* 997 F.2d at 981–82 (finding Venezuela an adequate alternate forum despite plaintiff's affidavit evidence of systemic corruption, delay, expense, political influence and bias against foreign litigants in Venezuelan justice system).

---

**2.** The only case this Court has found where a court considered and ruled on the adequacy of Russia as an alternate forum, although of limited value because it predated both the recent legal reforms and the 1998 financial crisis, found that Russia was an adequate forum and dismissed for *forum non conveniens. Rosinka Joint Venture v. Williams,* No. Civ. 93 0132624, 1993 WL 383301, at *3 (Conn.Super. Sept.16, 1993) (rejecting plaintiff's arguments that Russia's judicial system was in total disarray).

### 3. *Nonenforceability of NDF Contracts under Russian Law*

■ Finally, Parex argues that Russia is not an adequate alternate forum because, unlike New York law, Russian law does not recognize NDF contracts as legally enforceable. In support of this proposition, Parex submits a recent decision from the highest arbitration court in Russia, the Supreme Arbitrazh Court ("PSCA"). That court affirmed the findings of two lower courts holding that NDF contracts between banks such as the one at issue here are "disputable transactions" amounting to nothing more than "gambling" agreements "of a betting nature," which may not be enforced in Russian courts under the Article 1062 of Civil Code of the Russian Federation. (Parex Mem.Ex. G, Ruling of Presidium of Supreme Arbitration Tribunal of Russian Federation No. 5347/98 (June 8, 1999) (*Moskomprivatbank*).) Article 1062 of Russia's Civil Code provides that any claims connected to gaming or betting shall not receive judicial protection unless induced by fraud, threats or coercion. *See id.*

■ The adequate alternate forum inquiry is intended to provide assurance that the parties will receive a fair trial in the other forum, not that the plaintiff will necessarily win. *See Piper Aircraft*, 454 U.S. at 251, 102 S.Ct. 252 (stating that if alternate forum's more adverse laws were became a significant factor in United States courts' analysis, "[t]he flow of litigation into the United States would increase and further congest already crowded courts."); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.1975) ("A district court has discretion to dismiss an action under the doctrine of forum non conveniens, however, even though the law applicable in the alternative forum may be less favorable to the plaintiff's chance of recovery.") *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

At the same time, however, the alternate forum must at least allow litigation of a claim arising out of the disputed transaction. To say the least, *Moskomprivatbank*

casts serious doubt on the viability of Parex's claims if pursued in Russian courts, and suggests that this is one of the rare cases in which the alternate forum provides "no remedy at all." *Piper Aircraft*, 454 U.S. at 254, 102 S.Ct. 252. As noted above, very few cases have found alternative fora to be inadequate. Earlier cases considering this question have refused to dismiss after finding alternate fora inadequate for social or political reasons. *See, e.g., Menendez Rodriguez v. Pan Am. Life Ins. Co.*, 311 F.2d 429 (5th Cir.1962) (Castro's Cuba unavailable to Cuban political refugees as alternative forum), *vacated on other grounds*, 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964); *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y. 1983) (plaintiff would be executed if he returned to post-revolutionary Iran to litigate), *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985). More recently, courts have refused to dismiss where alternate fora would not allow plaintiffs to bring their claims. *See, e.g., Ceramic Corp. of America v. Inka Maritime Corp.*, 1 F.3d 947, 949 (9th Cir.1993) (plaintiff "will not be able to pursue any of its claims in Japan or obtain any relief in that forum."); *Shonac Corp. v. Marquesa Int'l Corp.*, 1988 WL 50601, at *3 (D.N.J. May 19, 1988) ("if such claims are unavailable as a matter of law in Brazil, plaintiff's remedies in the Brazilian courts appear inadequate, if not illusory").

Sberbank claims that, notwithstanding *Moskomprivatbank*, Parex "unquestionably can raise its breach of contract and deceptive business practice claims in a Russian court." (Sberbank Mem. at 7.) However, this argument ignores the entire thrust of *Moskomprivatbank*, which unquestionably held that NDF transactions are not cognizable as "contracts" under the Russian Civil Code. The decision was handed down by the highest court with jurisdiction over such a case, and it appears that there is no possibility of it being overturned on appeal. As a matter of law, although breach of contract and deceptive business practices causes of action exist,

no cause of action lies for the breach of NDF transactions.

Sberbank's argument that *Moskomprivatbank* was "correct" because both Germany and England have taken similar approaches to exchange contracts "for the difference" (*see* Sukhanov Reply Decl. at 3), misses the mark. The legitimacy of such a holding under Russian law or its origins in other European laws is not at issue here. The question is rather whether, by holding that NDF transactions do not constitute legally cognizable contracts, *Moskomprivatbank* deprives Parex of any remedy at all. Nowhere in its exhaustive submissions does Sberbank address this question.

Based upon the evidence presented, the *Moskomprivatbank* decision will "gut the core" of Parex's action. *Mercier v. Sheraton Intern., Inc.*, 935 F.2d 419, 427 (1st Cir.1991). Sberbank has failed to meet its burden of proving that Russia will provide any avenue of relief for Parex's claims as a matter of law in light of this recent decision. Russia is therefore "clearly unsatisfactory" as a forum for the vindication of claims involving NDF contracts, *see Piper Aircraft*, 454 U.S. at 254 n. 22, 102 S.Ct. 252, and it is unnecessary to proceed to balance the *Gilbert* factors.

Sberbank's motion to dismiss for *forum non conveniens* is denied at this time for lack of proof that Russia will permit any litigation of the NDF contract.

### V. *Failure to State a Claim for Deceptive Business Acts and Practices in Count II*

■■■■ Sberbank moves to dismiss Count II, the New York Deceptive Business Acts and Practices claim, NYGBL § 349 (McKinney 1998), for failure to state a claim upon which relief can be granted. Section 349 provides a cause of action to consumers injured by "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." NYGBL § 349. To state a claim under § 349, the complaint must plead that (1) the defendant's conduct was consumer-oriented, (2) the defendant engaged in a materially deceptive and misleading act, and (3) plaintiff was injured by the defendant's act. *See S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629 (2d Cir.1996); *D. Abraham, D.D.S. v. The Penn Mutual Life Insurance Co.*, No. 98 Civ. 6439(DC), 2000 WL 1051848 (S.D.N.Y. July 31, 2000).

■■■■ Although ostensibly directed at "any business," NYGBL § 349 is in fact only "directed at wrongs against the consuming public," *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). *See Shapiro v. Berkshire Life Insurance Co.*, 212 F.3d 121, 126 (2d Cir.2000). The threshold requirement of consumer-oriented conduct is met by proof that "the acts or practices have a broader impact on the consumer at large" in that they are "directed to consumers" or "potentially affect similarly situated consumers." *Oswego*, 85 N.Y.2d at 25–27, 623 N.Y.S.2d 529, 647 N.E.2d 741. Judge Weinfeld's opinion in *Genesco Entertainment v. Koch*, 593 F.Supp. 743 (S.D.N.Y.1984), is still instructive:

> The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides.... The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modelled on the Federal Trade Commission Act[, 15 U.S.C. § 45].

*Genesco Entertainment*, 593 F.Supp. at 751–52 (citations omitted).

Parex has made no showing that the currency exchange between the party banks in this case is "consumer-oriented" under NYGBL § 349, nor could it under current case law. Although business-to-business transactions could in some rare cases have a wide enough impact on consumers to justify a § 349 claim, *see Oswego,* 85 N.Y.2d at 25–26, 623 N.Y.S.2d 529, 647 N.E.2d 741, it is well established that "[p]rivate contract disputes, unique to the parties . . . would not fall within the ambit of the statute." *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). *See, e.g., Spirit Partners, L.P. v. Audiohighway.com,* No. 99 Civ. 9020(RJW), 2000 WL 685022, *7 (S.D.N.Y. May 25, 2000) (finding no § 349 claim for securities transactions); *Barroso v. Polymer Research Corp. of America,* 80 F.Supp.2d 39, 43 (W.D.N.Y. 1999) (no § 349 claim for manufacturer's action against chemical company); *Sheth v. New York Life Insurance Co.,* 2000 N.Y. Slip Op. 05665, 709 N.Y.S.2d 74, 75 (N.Y.App.Div. June 13, 2000) (finding no § 349 claim for act of life insurance company against prospective life insurance agents).

Parex cannot prove the first element of a § 349 claim, that Sberbank's act was "consumer-oriented." As a result, the Court need not address the other two elements of § 349 before dismissing Count II of the complaint.

### Conclusion

For the foregoing reasons, the motions to dismiss for lack of personal jurisdiction and *forum non conveniens* are denied, and the motion to dismiss Count II is granted.

It is so ordered.